STATE NATIONAL BANK *v.* TEMPLE COTTON OIL COMPANY.

4—2601

Opinion delivered June 13, 1932.

*James D. Head,* for appellant.

*Jones & Jones,* for appellee.

SMITH, J. This suit was begun in June, 1931, by the Temple Cotton Oil Company, hereinafter referred to as the oil company, to foreclose a deed of trust executed to it by Sanderson & Orton on January 22, 1923. The State National Bank, hereinafter referred to as the bank, held

a deed of trust on the property described in the oil company's deed of trust, and for that reason was made a party defendant. It was alleged that the oil company's deed of trust secured four notes as follows: One dated January 22, 1923, for $4,903.96, due December 1, 1925; one dated June 1, 1926, for $1,844.35, due November 1, 1926; one dated July 31, 1927, for $1,568.44, due ninety days after date; and one dated April 1, 1930, for $1,178.82 due November 1, 1930. The court decreed that the note first described was barred both as to Sanderson & Orton, and as to the bank also, but that the other three notes were secured by the deed of trust to the oil company, and that this deed of trust was prior to that of the bank, and decreed its foreclosure as a prior lien. From that portion of the decree holding that said three notes were secured by the oil company's deed of trust and constituted a lien superior to that of the bank, the bank has appealed. Sanderson & Orton have not appealed. The oil company has cross-appealed from that part of the decree holding that the note for $4,903.96 was barred.

Sanderson & Orton were large cotton planters, and operated two gins, ginning for themselves and for the public, and, in connection with their ginning business, they bought cotton seed, which they sold to the oil company. They entered into a written contract with the oil company on October 10, 1922, whereby they agreed to sell the oil company all cotton seed owned or controlled by them up to the close of the season of 1923-1924, at a price $5 per ton in excess of the prevailing street prices. The contract provided that the oil company might apply this $5 bonus to any indebtedness then owing to the oil company or which might thereafter be incurred, and that the contract might be extended by mutual agreement in writing to cover subsequent ginning seasons. The parties extended this agreement orally, but not in writing, from season to season thereafter, and continued to operate under the oral extension until the close of the ginning season of 1930-1931.

Prior to the execution of this seed purchase contract, Orton owed the predecessor of the oil company $5,500, and he and Sanderson were indebted to the Gullett Gin Company in the sum of about $9,000. To refinance these debts, Sanderson & Orton, on January 22, 1923, executed two notes for $5,000 each and a third for $4,903.96, due, respectively, December 1, 1923, 1924 and 1925, and, as security therefor, executed the deed of trust here sought to be foreclosed. The note for $4,903.96 matured on the date last named.

Beginning in 1925, Sanderson & Orton borrowed money from the bank for use in their farming operations, and executed deeds of trust each year to secure these advances. These deeds of trust included the gin properties described in the oil company's deed of trust and other property, both real and personal, in addition, and each of these deeds of trust executed previously to 1931 to the bank by Sanderson & Orton recited the priority of the oil company's deed of trust as to the gin properties therein described.

In February, 1931, representation was made to the bank by Sanderson & Orton that the gin properties were no longer subject to the oil company's deed of trust, and a new deed of trust was then taken by the bank from Sanderson & Orton which contained no reference to the oil company's deed of trust. This deed of trust was given to secure a large balance then due the bank, and an additional advance of $2,000, which the bank agreed to make and which was later made; in fact, the subsequent advances by the bank to Sanderson & Orton largely exceeded that amount. This deed of trust, executed in February, 1931, embraced not only the gin properties but a large amount of other property, both real and personal, owned by Sanderson & Orton.

In the meantime, Sanderson & Orton were buying and selling seed to the oil company under their seed contract. Pursuant to this contract the oil company made large advances of money, which were not fully repaid by seed delivered under that contract, and the notes above

referred to, dated June 1, 1926, due November 1, 1926; July 31, 1927, due ninety days after date; and April 1, 1930, due November 1, 1930, were executed to cover deficiencies arising out of the purchase of seed. The two notes for $5,000 each, specifically described in the deed of trust to the oil company, due, respectively, December 1, 1923 and 1924, were paid, but the note due December 1, 1925, for $4,903.96, was not paid. However, on November 18, 1930, the oil company indorsed on that note a credit of $89.62 which it contends it was authorized to do, as having on that date that balance on hand to the credit of Sanderson & Orton. The oil company also contends that the $4,903.96 note had been kept alive by the repeated acknowledgments of its validity by Sanderson & Orton and by their repeated promises to pay it, in consideration for which promises the date of payment had been extended.

We have therefore for decision the following questions: Was the $4,903.96 note barred? Were the advances made subsequent to the execution of the seed contract secured by that contract alone, or were they secured also by the deed of trust from Sanderson & Orton to the oil company? Did the oil company's deed of trust secure advances made after December 1, 1925? Conceding that the oil company's deed of trust was intended to secure, and did secure, the three notes of Sanderson & Orton executed in 1926, 1927 and 1930, was the right of foreclosure not barred as to the bank?

Other facts will be stated in the discussion of these questions. Separate answers were filed by both the bank and Sanderson & Orton, but they present a common defense.

The agreement referred to as the seed contract contemplated the advancement of large sums of money by the oil company to Sanderson & Orton, which were made during each of the years it continued in effect, and all parties agree that it was extended orally and was in effect until the termination of the relations out of which this litigation arose. The said contract was dated Oc-

tober 10, 1922. The deed of trust was dated January 22, 1923. The deed of trust specifically described the two $5,000 notes above referred to and the note for $4,903.96, due December 1, 1925.

The deed of trust further recited that "This deed of trust shall also be a security for any other indebtedness that the first parties may now or may hereafter owe to the third party; and shall also be security for any notes, drafts, accounts or debts of whatsoever kind that the said third party may hold against the first parties herein, by purchase as an assignee thereof, or otherwise, and for all future advances during the life of this trust."

The deed of trust further provided that: "If the said parties of the first part * * * shall pay all sums of money due thereon, as aforesaid, when the same shall become due and payable, together with all other indebtedness as aforesaid that may be due by the parties of the first part to the party of the third part, * * *, then this deed of trust shall be null and void, and shall be released at the expense of the parties of the first part; but if default be made in the payment of said note or notes, or either of them, or the interest thereon, * * * when the same shall become due and payable, or in the payment of any other indebtedness that the parties of the first part may be due the party of the third part, when the same shall become due and payable, as aforesaid, then all of the said indebtedness shall become due and payable at once." The deed of trust contained the usual provisions in regard to sale in the event of default.

The two notes for $5,000 each described in the deed of trust were paid, but the note for $4,903.96 was not paid. Sanderson & Orton did not repay all the advances made in their operations for the 1925 season, and that balance was covered by the note dated June 1, 1926, for $1,844.35, due November 1, 1926. The advances for the 1926 season were not all paid, and the balance due on the operations for that season were covered by the note dated July 31, 1927, for $1,568.44, due ninety days after date. The advances for the 1929 season were not all paid, and

that balance was covered by the note dated April 1, 1930, for $1,178.82, due November 1, 1930. It is alleged that the deed of trust secured these three notes, as well as the note for $4,903.96, and the foreclosure of the deed of trust was prayed to enforce their payment.

As we have said, the court found that the note for $4,903.96 was barred, and the cross-appeal questions the correctness of this finding.

Unless the payment of $89.62 indorsed upon the note was authorized and was made, that note was barred when the suit was brought. It was contended by the oil company that this note had been kept alive by the promises of Sanderson & Orton made from time to time to pay it, in consideration of which promises the time for its payment had been extended. It is also contended that the credit was authorized, and was made by applying the balance then in the hands of the oil company as a credit on the note. Sanderson & Orton denied there was such a credit, and denied also that they had made promises to pay the note, in consideration of which promises the note had been extended. The chancellor found, upon conflicting evidence, which we do not recite, that the note had not been extended, and, as this finding does not appear to be contrary to the preponderance of the evidence, that finding must be affirmed, and it is so ordered.

The principal and controlling question in the case is whether the deed of trust secured the three notes above described, executed since the date of the deed of trust.

In the excellent briefs of opposing counsel, there have been collected and cited most, if not all, of our recent cases dealing with the question of future advances under mortgages and deeds of trust. These cases have clearly defined the law of that subject, and we shall not review them. In some of those cases such advances were held to be secured; in others, not; the distinction depending upon the provisions of the various instruments under review. One of the latest of these cases is that of *American Bank & Trust Company* v. *First National Bank of Paris,* 184 Ark. 689, 43 S. W. (2d) 248, where a number

of the earlier cases are reviewed, and their holdings are summarized in that opinion by the following statements of the law:

One may execute a valid mortgage to secure a debt to be contracted in the future, but, in order to do so, there must be an unequivocal agreement in the instrument itself that it is given for debts to be incurred in the future.

That a mortgage or deed of trust given to secure future advances is valid, but, if such purpose is intended to be accomplished, that fact must clearly appear from the instrument, and such purpose will not be presumed where the instrument does not contain a general description of the indebtedness secured so as to put one who examines it on notice that this was its purpose, in order that such person may pursue the inquiry which such knowledge would suggest.

And further, that the circumstances attendant upon the execution of the instrument and the nature of the transaction subsequent thereto are to be taken into account in determining the effect of the instrument, and each case therefore calls for a construction of the language employed in the instrument to determine whether it secures future advances or not.

We there also said that, for future advances to be secured by an instrument, that purpose must be unequivocally stated, and, unless the nature of such advances are otherwise clearly defined, they must bear some relation to the subject-matter for which the primary debt is incurred and which the mortgage is given to secure.

Under these tests we have concluded that the notes in question (except the one for $4,903.96) are secured by the deed of trust here sought to be foreclosed.

The seed contract was the one under which the parties began to operate. At the time of the execution of the deed of trust, it was contemplated that these operations would be enlarged, and that large future advances would be made, and the purpose of the deed of trust was to secure them. We think the language of that in-

strument, quoted above, manifests that purpose. The purpose of both the seed contract and the deed of trust was to secure the payment of the large advances contemplated by the parties, and which were later made. There was no inconsistency in taking the additional security which the deed of trust afforded. Under the seed contract only seed delivered could be applied to the advances. Under the deed of trust the gin properties were offered as additional security. All these transactions bore the most intimate relation to each other; indeed, it is very difficult to separate them. The oil company not only advanced money to buy seed, but also advanced money to buy large quantities of bagging and ties, and no separate accounts were kept distinguishing these advances. They were all a part of the contemplated operations of the parties under both the seed contract and the deed of trust. The bank was advised of the fact that the oil company was relying upon the security of its deed of trust for the payment of all these advances, and in all of the deeds of trust which the bank took to secure its own advances to Sanderson & Orton except the last, that dated February 11, 1931, it was expressly recited that those instruments were subject to the deed of trust to the oil company. The bank's last deed of trust did not contain this recital.

The notes to the oil company covering advances, as herein stated, were all taken before the $4,903.96 note, specifically described in the deed of trust, was barred. The trust created by that instrument had not therefore been discharged when the notes here involved were taken, and they were therefore advances made within the life of the trust.

The views here expressed render it unnecessary to consider other interesting questions discussed in the briefs except the effect of the accelerating clause set out above. It is argued that the effect of this clause reading that "when the same shall become due and payable, as aforesaid, then all of the said indebtedness shall become due and payable at once," was to limit the security of the

deed of trust to such advances as had been made on or before the date of the maturity of the $4,903.96 note. We do not agree, however, that this was the purpose or effect of the clause quoted. The three notes here involved were all executed subsequent to the maturity of the note for $4,903.96, but before that note was barred and within the lifetime of the trust.

The case is distinguishable from the case of *Patterson* v. *Ogles,* 152 Ark. 395, 238 S. W. 598. In that case it was held (to quote a headnote) that: "Under a mortgage to secure a certain note and 'any and all other and further indebtedness which the grantors or either of them may contract to pay to the grantee for future loans, advances or acceptances, made during the existence of this mortgage, and any renewal or renewals of note or notes for said present or future indebtedness; this mortgage to mature and be enforceable at the maturity of said note or subsequent notes, or renewal note or notes'; *held* that the mortgage limits the secured debt to advances made up to the maturity of the note or any renewal thereof."

In the instant case the language quoted (which appears in the defeasance clause) does not provide that the deed of trust shall mature and be enforceable at the maturity of the notes. On the contrary, we construe the deed of trust to mean, when all of its provisions are read together, that it shall be security for the payment of any other liability or indebtedness of the grantor already or thereafter contracted until the right to foreclose the deed of trust was barred. *Price* v. *Williams,* 179 Ark. 13, 13 S. W. (2d) 822. It may be conceded that the deed of trust was barred when the debt was barred, but the note for $4,903.96 was not barred until five years after the date of the maturity, which date was December 1, 1925. But before that note was barred, and while the lien of the deed of trust was in effect, the notes here involved were executed, and they, too, were secured by the deed of trust, because that instrument so expressly provides.

Learned counsel for appellant quotes from § 139 of the chapter on Limitation of Actions, 17 R. C. L., page 771, as follows: "If a contract provides that on default in the payment of one of several notes the remaining unpaid notes shall become due, according to the weight of authority, the stipulation has the effect of fixing a contingency upon the happening of which the debt is to mature at a time earlier than the dates given in the notes for their maturity, and the statute of limitations begins to run against the entire debt upon such default. And the creditor cannot by his act alone change that effect, but the parties may by mutual agreement change the effect of the default and treat the contract as if no default had been made."

Here the evidence shows that the parties, by mutual agreement, changed the effect of the default and treated the contract as if no default had been made by executing other notes within the life of the trust. We think this conclusion is fairly inferable from the conduct of the parties to this instrument. There was no attempt or threat of foreclosure, which would, no doubt, have been had if either party had taken the position that the trust had been closed by the maturity and nonpayment of the $4,903.96 note. If only this note was secured, there has been such delay as would have barred the foreclosure of the deed of trust. On the contrary, the parties continued to operate under the faith of the security afforded by the deed of trust, and advances were made and received pursuant thereto, the balances due thereon being evidenced by the notes here sued on.

The bank took six mortgages from Sanderson & Orton securing its advances, and the latest of these, dated February 11, 1931, was the only mortgage which did not recite the priority of the oil company's deed of trust. The last mortgage previously executed, and which, like those antedating it, recognized the priority of the oil company's deed of trust, was dated February 10, 1930, and only one of the three notes here involved was executed on a later date. But all three of the notes here involved were exe-

cuted prior to the date of the bank's last mortgage, the one which did not expressly recognize the priority of the oil company's deed of trust. As all three of the notes were executed during the life of the trust created by the oil company's deed of trust, we hold that this lien securing their payment is prior to the lien of the bank.

In the case of *Hollan* v. *American Bank of Commerce & Trust Company*, 168 Ark. 939, 272 S. W. 654, a mortgage had been given to secure two notes, there specifically described, and upon the foreclosure of that instrument it was sought to include other indebtedness, but it was insisted that the language of the mortgage should be interpreted to refer only to indebtedness incurred up to the date of the maturity of the two notes described in the mortgage. It was there said: "Placing that interpretation on the language of the mortgage does not help appellant's cause, for, according to the undisputed evidence, there was an agreement extending the date of the maturity of the notes to a date beyond the time that the additional indebtedness was incurred. But we are of the opinion that the construction contended for by counsel for appellants is not the correct one. In the case of *Fort* v. *Black*, 50 Ark. 256, 7 S. W. 131, there was involved the interpretation of a mortgage to secure a promissory note and to secure 'supplies furnished and to be furnished,' and this court held that the mortgage covered only advances made up to the date of the maturity of the note. In later cases involving mortgages, using broader language, we have held that the mortgage covered any indebtedness up to the time of the foreclosure. Each instrument, of course, must be interpreted according to its particular language, and, in order to interpret the present mortgage in accordance with the contention of counsel for appellants, it would be necessary to wholly reject the language in the mortgage which has an unmistakable meaning. *Howell* v. *Walker*, 111 Ark. 362, 164 S. W. 746; *Word* v. *Cole*, 122 Ark. 457, 183 S. W. 757. We must interpret the language of this mortgage to mean just what it says—that it secures any indebtedness incurred up to

the time of the foreclosure. It is a matter of contract between the parties, as there is no limitation upon the right to contract with reference to the extent of the debt secured by a mortgage, and the province of the court is merely to interpret the language and declare the rights of the parties in accordance with their intention as expressed in the language used.''

Here we have an instrument which secures "all future advances during the life of this trust," and, as the advances were made during the life of the trust, they were secured by it.

The decision of the court below conformed to this view, and, as we think this is the correct construction of the deed of trust, that decree must be affirmed, and it is so ordered.